UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ORENE ESPOSITO,<br><br>    Plaintiff,<br><br>v.<br><br>WATERMARK LODGING TRUST, INC., MICHAEL G. MEDZIGIAN, BRENDAN M. MEDZIGIAN, SAMUEL C. ZINMASTER, ROBERT E. PARSONS, JR., CHARLES S. HENRY, KATHERINE G. LUGAR, SIMON M. TURNER, RUSSELL GIMESTOB, ALEXANDER HALPERN, MICHAEL D. JOHNSON, and WILLIAM H. REYNOLDS, JR.;<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF SECTION 14(a) and 20(a) OF THE SECURITIES AND EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Orene Esposito, ("Plaintiff"), by and through the undersigned counsel, alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation, review and analysis of public filings made by Watermark Lodging Trust, Inc. ("Watermark" or the "Company") and any predecessors thereto, with the U.S. Securities and Exchange Commission ("SEC"), and review and analysis of the press releases and other publicly available information regarding the impending acquisition of all the outstanding securities of Watermark, by certain entities affiliated with Brookfield Asset Management Inc. ("Brookfield") in a cash acquisition (the "Transaction").

1

## **NATURE OF THE ACTION**

1.  Plaintiff brings this action to cure violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed acquisition of Watermark by Brookfield. Pursuant to the Transaction, Brookfield will be purchasing all of the outstanding Class A shares of Watermark for $6.68 per share, all of the outstanding Class T shares for $6.699 per shares, and all other outstanding securities.

2.  On May 6, 2022, Watermark announced the Transaction stating:

**WATERMARK LODGING TRUST TO BE ACQUIRED BY BROOKFIELD REAL ESTATE FUNDS**

*$3.8 Billion All-Cash Transaction Provides Liquidity for Watermark Lodging Trust Stockholders*

**Chicago, May 6, 2022** – Watermark Lodging Trust, Inc. ("Watermark," "WLT" or the "Company") announced today that it has entered into a definitive agreement with private real estate funds managed by Brookfield ("Brookfield"), under which Brookfield will acquire all of the outstanding shares of common stock of Watermark for $6.768 per Class A share and $6.699 per Class T share in an all-cash transaction valued at $3.8 billion, including the assumption of debt and preferred equity. The purchase price represents a premium of over 7.5% from the most recently published Net Asset Values per share as of December 31, 2021, of $6.29 per Class A share and $6.22 per Class T share.

The Watermark portfolio, built over a decade of investing and intensive asset management, is comprised of high-quality lodging assets consisting of 25 properties totaling over 8,100 rooms. These luxury and upper upscale assets are located in drive-to leisure destinations and gateway urban cities across 14 states with a high concentration in the Sun Belt region.

"We are very pleased to reach this agreement with Brookfield, as it achieves our longer-term objective of a liquidity event, while providing our stockholders with an immediate and certain cash value," said Michael Medzigian, Chairman and CEO of Watermark. "The transaction's premium to our most recently published Net Asset Values per share represents the strong execution of our entire team who have demonstrated the ability to find innovative solutions to address the challenges brought on by the COVID-19 pandemic. I would like to thank the members of our Watermark team, across all functions, for their dedication and hard work over the past several years."

"Hotels and resorts of this scale and quality are difficult to replicate," said Lowell Baron, Managing Partner and Chief Investment Officer in Brookfield's Real Estate Group. "This portfolio is well positioned given its concentration in high barrier to entry coastal destinations, gateway cities and the sunbelt."

Completion of the transaction is subject to certain closing conditions, including the approval of Watermark's stockholders. The proposed transaction has been unanimously approved by the Watermark Board of Directors and is expected to close in the fourth quarter of 2022.

3. The Transaction is inadequate and unfair. Shareholders will be receiving consideration based upon a depressed net asset value ("NAV") for the Company given the Covid-19 pandemic and its affect on the hotel industry. In the meanwhile, Defendants Michael G. Medzigian ("Medzigian"), Brendan M. Medzigian ("B. Medzigian") and Samuel C. Zinmaster ("Zinmast", with Medzigian and B. Medizian, the "Executive Defendants") will be walking away with millions in remuneration, including accelerated payments for their restrictive stock units ("RSUs"), and bonuses based upon their 2022 performance.

4. On May 27, 2022, the Company filed a Schedule 14A, Preliminary Proxy Statement (the "Preliminary Proxy") with the SEC, to be used to solicit: (1) shareholder approval of the Transaction; (2) a non-binding advisory vote (the "Advisory Vote") in favor of the compensation to be paid or become payable to certain executive officers of the Company as a result of the Transaction; and (3) to approve any adjournment of the special meeting at which approval of the Transaction and the Advisory Vote are to occur.

5. The Preliminary Proxy, as detailed below, fails to disclose material information necessary for Watermark shareholders to properly assess the fairness of the Transaction, certain conflicts in the process leading to the Transaction, and the compensation to be paid to certain executives in the Transaction, thereby rendering statements in the Preliminary Proxy materially incomplete and misleading. In particular, the Background of the Merger ("Background") and the fairness opinion ("Fairness Opinion"), rendered by Morgan Stanley & Co. LLC ("Morgan Stanley") are material misleading and the Fairness Opinion was crafted to mislead Watermark shareholders into approving an unfair and inadequate Transaction.

6. It is imperative that the material information that has been omitted from or misstated in the Preliminary Proxy be disclosed to Watermark shareholders and/or that the

analysis in the Fairness Opinion, among other things, be included in any final Proxy, prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 and Section 20(a).

7. Plaintiff seeks to enjoin Defendants from holding a shareholder vote on the Transaction and taking any steps to consummate the Transaction unless and until the material information discussed below is disclosed to Watermark shareholders sufficiently in advance of the vote on the Transaction or, in the event the proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This is not a collusive one to confer jurisdiction on a court of the United States, that it would not otherwise have.

9. Personal jurisdiction exists over each Defendant because Defendant Watermark is a Maryland corporation with a principal place of business in Chicago. The individual defendants ("Individual Defendants") have committed wrongdoing in this State and are present in this state for jurisdictional purposes or have sufficient minimum contacts with this State and district so as to render the exercise of personal jurisdiction over them by this Court as permissible under traditional notions of fair play and justice. In connection with the wrongs alleged herein, Defendants used the mails and the means or instrumentalities of interstate commerce.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391, because Defendant Watermark is incorporated in Maryland, and each of the Defendants have extensive contacts and do business in this State and judicial district.

## Parties

11. Plaintiff has been a shareholder of Watermark at all times relevant hereto.

12. Defendant Watermark is a real estate investment trust ("REIT"), that is incorporated in Maryland, and maintains its principal place of business at 150 North Riverside Plaza, Chicago, Illinois. Watermark was the resulting company after the merger of two REITs, Carey Watermark Investors Incorporated ("CW1") and Carey Watermark Investors 2 ("CW 2"), which were rolled up in about March 2020 (the "Roll Up"). It has about 25 hotel properties.

13. Defendant Michael G. Medzigian ("Medzigian") is the Chief Executive Officer, President and Chairman of the Board of Watermark. He served as the Chief Executive Officer of both CW1 and CW2 prior to the Roll Up. He is also the managing member of Watermark Capital Partners ("WCP"), LLC, a private real estate investment firm that raises capital to invest in lodging properties, and has 1% of the Company's operating partnership ("OP") of Watermark. WCP also acted as a subadvisor to the advisor ("Advisor") for CW1 and CW2 before the Roll Up. WCP received 2,840,549 limited partnership units of CW 2 OP, LP, the operating partnership for CW 2 (renamed Watermark), then worth about $27 million in the Roll Up pursuant to which the Advisor, which had been external, was internalized.

14. At about the time of the Roll Up, Medzigian entered into an employment agreement in which he became the Chairman and Chief Executive Officer CW 2 (now Watermark), pursuant to which he received a salary, a bonus based upon the achievement of certain corporate

and individual performance goals, and $6 million in RSUs which were to vest at the rate of 25% each year.

15. He also entered into a commitment agreement, in which he agreed to commit his business activities to CW1 and CW2, until at least 12 months after the termination of the subadvisory agreements, or 18 months after the effective date of the commitment agreement, whichever is earlier.

16. Medzigian is going to receive as least $17 million in remuneration plus an advisory agreement for WCP, as a consequence of the Transaction and the sale of the Company as this time.

17. Brendan M. Medzigian ("B. Medzigian") has been Watermark's Chief Investment Officer since December 2021. Prior to that time, he was head of Capital Markets and Head of Transactions. He has been with the Company since 2017, and is one of Medzigian's sons. B. Medzigian is going to receive remuneration of at least $3.5 million as a result of the Transaction and the sale of the Company as this time.

18. Samuel C. Zinmaster ("Zinmaster") has been the Chief Operating Officer of Watermark since December 2021. Prior to that time, he was the head of asset management. Zinmaster to going to receive remuneration of about $3.1 million as a result of the Transaction and the sale of the Company at this time.

19. Robert E. Parsons, Jr. ("Parsons") has served on the Board of the Company since 2015 and was also a director of CW 1.

20. Charles S. Henry ("Henry") has served on the Board since April 2020 and was also director of CW1.

21. Katherine G. Lugar ("Lugar") has served on the Board since December 2018.

22. Simon M. Turner ("Turner") has served on the Board since April 2020 and was a director of CW 1.

23. Russell Gimelstob ("Gimelstob") has served on the Board since July 2020 and was placed on the Board by purchasers of the Company's Series B preferred stock, which will be purchased as a consequence of the Transaction.

24. Alexander Halpern ("Halpern") has served on the Board since July 2020 and was placed on the Board by the purchasers of the Company's Series B preferred stock, which will be purchased as a consequence of the Transaction.

25. Michael D. Johnson ("Johnson") has served on the Board since April 2020, and was a director of CW 1.

26. William H. Reynolds, Jr. ("Reynolds", with Medzigian, B. Medzigian, Zinmaster, Parsons, Henry, Lugar, Turner, Gimelstob, Halpern, and Johnson, the "Individual Defendants") has served on the Board since February 2015 and was a director of CW1.

Background of the Merger

27. In about March 2020, CW1 and CW2 shareholders were each asked to approve the roll up of both entities forming Watermark. The proxy used to solicit shareholder approval (the "Roll Up Proxy") specifically sought shareholder approval of both the Roll Up and the elimination of any charter provisions that prevented a roll up of the entities.

28. The purported reasons for the Roll Up and the internalization of the Advisor, leading to multi-million payments to its subadvisor, WCP, an entity controlled by Medzigian, as well as lucrative agreements for Medzigian was, among others, to enable Watermark to position itself for a future liquidity event through the public markets, and to reduce operating costs and increase efficiencies resulting in a higher EBITDA.

29. Two years later, the Company is not seeking a liquidity event through the public markets, despite shareholders having paid to internalize the Advisor, and providing Medzigian with lucrative employment and other remuneration for that purpose.

30. Rather it is now seeking to sell itself to the highest bidder, all of whom offered a price barely over the current depressed net asset value the Company is presently experiencing.

31. The current price being paid in the Transaction of approximately $3.8 billion is over a billion less than the Company's combined enterprise value as of December 31, 2018 and fails to take into account the current upswing that the hotel industry is experiencing since the diminishment of the Covid-19 pandemic.

32. While the Covid-19 pandemic has hurt the hotel industry, a sale now, at a time when countries are re-opening and travel and the hotel industry are recovering at over $1 billion less than the Company was previously fetching, is inadequate.

33. Shareholders have not received distributions in two years and will receive a price based upon a depressed NAV in the Transaction. Nonetheless, Medzigian, his son B. Medzigian and Zinmaster are walking away with millions of dollars in severance, accelerated RSU payments and an advisory agreement for WCP, which Defendants are asking shareholders to approve through an Advisory Vote.

34. Specifically, Medzigian, B. Medzigian and Zinmaster will be receiving "golden parachute" compensation as follows:

| Name | Cash | Equity (value of accelerated RSUs) | Perquisites/Benefits (Healthcare) | Total |
|---|---|---|---|---|
| Medzigian | 8,851,825 | 8,820,964 | 36,000 | 17,708,839 |
| B. Medzigian | 2,783,334 | 731,045 | 0 | 3,514,379 |

| Zinmaster | 2,500,00 | 685,435 | 0 | 3,185,435 |

35. The cash amounts include cash severance and accelerated payments of cash bonuses for fiscal year 2022, assuming target performance, even though the Company is being sold on the cheap. It also includes cash retention payments of up to $1.8 million for B. Medzigian and Zinmaster, for employment during the interim period from the execution of the Merger Agreement until three months after the closing of the Transaction which was negotiated as part of the Transaction although the Company is not making any further acquisitions or sales during this period. This is in addition to severance and retention amounts being paid under separate agreements with the Company which were negotiated at the end of 2021, when the Company knew that it was going to sell itself, as discussed below.

36. Medzigian's employment agreement further was amended to ensure that he receive the maximum severance available of $7,531,875.

37. Moreover, at the same time that the Merger Agreement was being negotiated, Medzegian, on behalf of himself and WCP, his wholly owned company, negotiated a term sheet pursuant to which Brookfield will be engaging WCP to provide certain services for certain of the Company's properties which will be placed in separate REITS at an annual fee of $1 million and reimbursement of expenses and costs.

38. While shareholders are getting consideration based upon a depressed NAV, after failing to receive two years of distributions, the Medzigians and Zinmaster are walking away from the Transaction with millions of dollars, retention of at least several months after the Transaction and an advisory contract for WCP.

<u>The Preliminary Proxy is Material Misleading and/or Omits Material Information</u>

39. The Preliminary Proxy further is materially misleading and omits material information necessary for shareholders to make an informed decision.

<u>The Background of the Merger Omits Material Information</u>

40. The Background of the Merger ("Background") omits material disclosures which demonstrate that the Transaction is the product of a conflicted process, which was directed at earning members of the Medzigian family as much money as possible.

41. The Background fails to disclose that on November 11, 2021, the same day that the Company retained Morgan Stanley to commence contacting bidders for a potential sale of the Company, the Company entered into an "Employee Retention and Severance Plan" with B. Medzigian and Zinmaster. This agreement ensured B. Medzigian a cash retention benefit of $550,000, and Zinmaster a cash retention benefit of $400,000, payable three months after the closing of a transaction, and severance amounts for B. Medzigian, equal to $866,667 and for Zinmaster equal to $800,000 payable for a severance eligible termination—thus guaranteeing them massive payments upon the sale of the Company which Medzigian had already decided was going to occur.

42. The Background of the Merger further fails to disclose whether any bidders other than Brookfield were willing to provide B. Medzigian and Zinmaster with interim compensation, or whether any other bidder was willing to retain WCP as an advisor to any of the Company's properties, facts which are directly relevant to the issue of whether Brookfield was a favored bidder because of its willingness to make these payments to the Medzigians, and Zinmaster.

43. It further states that on February 9, 2022, the Company engaged the real estate firm, Hodges Ward Elliot, Inc. to help bidders assess the value of the Company's real estate in connection with the transaction process, but fails to disclose that retaining that company was yet

another way for another of Medzigian's sons, Conner Medzigian, to earn money, as he is a acts as a vice president of that company.

44. Additionally, while the Background indicates that the Board considered whether a merger was more favorable to shareholders than other strategic transactions, including remaining as a standalone entity or listing the Company's common stock, it fails to disclose any analysis of those alternatives and the consideration that could be obtained by the Company's shareholders in those instances, particularly if the Company remained as a standalone company.

45. The Background specifically states that on April 28, 2022, that "[r]epresentatives of Morgan Stanley also reviewed with the directors, among other things, the current state of the travel and lodging industry." The Preliminary Proxy, however, fails to disclose this analysis—an issue that is material to this Transaction.

46. It further fails to disclose the percentage of occupancy of the Company's hotels and the projected occupancy rates, the RevPAR or the revenue per available room, or the ADR, or average daily rate per room that either the Company or the industry were experiencing in order to enable shareholders to have a basis for determining whether to relinquish their equity investment in the Company now, or whether the Company could continue and thrive as a standalone company and eventually provide them with greater consideration.

<u>Projections</u>

47. The Preliminary Proxy contains Unaudited Prospective Financial Information for the Company, including non-GAAP financial measures such as Hotel EBIDA, Net Operating Income, Corporate EBITDA and Unlevered Free Cash Flows.

48. The Preliminary Proxy, however, fails to disclose a reconciliation of the GAAP and non-GAAP measures as required by Regulation S-K.

49. The financial projections further fail to disclose the line items underlying the financial projections.

The Fairness Opinion

50. The Morgan Stanley Fairness Opinion omits material information and/or is misleading in other respects that should be corrected so that the Preliminary Proxy and any final proxy is fully accurate and contains all material information.

51. Net Asset Value Analysis: Morgan Stanley first performs a Net Asset Value Analysis. In that analysis, Morgan Stanley derived an "adjusted NAV" based upon the published appraisal performed by CBRE, and estimates of the fair market value of the Company's debt provided by Robert A. Stanger & Co. Those appraisals and estimates are not disclosed in the Preliminary Proxy and should be disclosed as they were relied upon by Morgan Stanley in formulating the Fairness Opinion.

52. Most importantly, the Net Asset Valuation calculates a blended NAV Net of Transaction Costs of $5.89 per share by, among other things, taking out of the NAV, the costs to Brookfield of buying out or redeeming the warrants, Class A OP units, certain Class A shares, and the $143 million in transaction costs that Brookfield will incur in the Transaction to derive an adjusted NAV Net of Transaction Costs.

53. But this has nothing to do with the shareholders who are being asked to vote on the Transaction, and is merely an attempt to mislead them into believing that their shares only have a Net Asset Value of $5.89 per share so that the amount of consideration that they are to receive is well above the NAV of their shares.

54. Discounted Cash Flow Analysis: Morgan Stanley also performed a Discounted Cash Flow Analysis. This analysis fails to disclose, however, the terminal values used, the inputs and assumptions underlying the discount rates and perpetuity growth rates it used in performing its discounted cash flow analysis.

55. In performing this analysis, Morgan Stanley determined the Company's unlevered free cash flows which it calculated by deducting from Corporate EBTIDA on a yearly basis, the Company's new capital expenditures and made other adjustments which it fails to disclose.

56. It then deducted from the implied enterprise value, the Company's net debt and the cost of liquidating or redeeming other securities, to derive implied equity values from which it deducted incremental projected capital expenditures, based upon third party data sources and guidance. These are inputs that Morgan Stanley fails to disclose.

57. Public Trading Comparables Analysis: Morgan Stanley then derived an implied price per share based upon a public company comparables analysis, in which it took seven presumably comparable publicly traded REITs and derived a number of multiples which it applied to the Company.

58. This analysis is particularly misleading. In the first instance, Morgan Stanley used seven allegedly comparable companies, although they are all publicly traded and therefore are not comparable.

59. Second, it derived a number of multiples based upon the "selected companies top quartile" and "bottom quartile", but with only seven companies, it effectively used the multiples for one company (it fails to disclose how many companies fall within a quartile of seven companies.)

60. It then derives the following multiples: adjusted aggregate value to 2022 EBITDA, adjusted aggregate value to 2023 EBITDA, and NAV premium or discount derived by comparing the closing price of the comparable company's shares on April 29, 2022, to research consensus net asset value for that company, although it fails to disclose what research analysts it reviewed or considered or what the NAVs were that these analysts derived.

61. Selected Precedent M&A Transaction Analysis: Finally, Morgan Stanley performed a Selected Precedent M&A Transaction Analysis, selecting a mishmash of presumably comparable transactions, including those that were not going private transactions like the Transaction. Thus, its selection of precedent transactions alone is dubious.

62. It then performs a number of analyses including premium/discount to Consensus NAV but adjusts the Company's NAV to derive a range in which the consideration being offered will fall. However, it never discloses why it makes this adjustment or how much the adjustment is so that shareholders can determine whether the consideration they are going to receive actually falls within the range of fairness.

The Advisory Compensation Proposal

63. The Preliminary Proxy then seeks to solicit an Advisory Vote on the compensation that certain of the Company's executives will receive in the Transaction.

64. However, the "golden parachute" chart fails to take into account the amount of consideration to be received by Medzigian through WCP, including advisory payments to be made and consideration to be received in the buy out of the OP units, which is not calculated anywhere in the Preliminary Proxy.

65. It further fails to disclose why Medzigian, B. Medzigian or Zinmaster are receiving bonuses based upon the Company's 2022 performance when the Company is being sold at a bargain price, and/or how much these particular unearned bonuses are worth.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER

66. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67. Section 14(a)(1) makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. §78n(a)(1).

68. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) provides that communications with shareholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

69. Defendants have issued the Preliminary Proxy with the intention of soliciting shareholders' support for the proposed merger. Each Defendant reviewed and authorized the

dissemination of the Preliminary Proxy, which omits critical information regarding, among other things, the background of the Transaction and financial projections for the Company.

70. In so doing, Defendants omitted material facts necessary to make the statements made not misleading. Each Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a). Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Preliminary Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

71. Defendants knew or were negligent in not knowing that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the proposed merger.

72. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Preliminary Proxy, rendering the Preliminary Proxy materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Preliminary Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

73. Defendants were, at the very least, negligent in preparing and reviewing the Preliminary Proxy. The preparation of a proxy statement by corporate insiders omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Preliminary Proxy or failing to notice the material omissions in the

Preliminary Proxy upon reviewing it, which they were required to do carefully as Watermark directors.

74. The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff, who will be deprived of its right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the proposed Transaction.

75. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**Count II**

**Violations of Section 20(a) of the Exchange Act**

76. Plaintiff repeats all previous allegations as if set forth herein.

77. The Individual Defendants were privy to non-public information concerning the Company and its business and operations through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Plaintiff in his capacity as a Company stockholder.

78. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.

The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy. The Individual Defendants were provided with copies of, reviewed and approved and/or signed the Preliminary Proxy before its issuance and had the ability or opportunity to prevent is issuance or to cause it to be corrected.

79. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of Watermark, the information contained in its SEC filing, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations and omissions specified herein had not been properly disclosed and were being concealed from Plaintiff and the Company, and that the Preliminary Proxy was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations and omissions of material fact contained therein.

80. The Individual Defendants acted as controlling persons of Watermark within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Watermark to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Watermark and all its employees.  As alleged above, Watermark is a primary violator of Section 14(a) of the Exchange Ac.  By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Enjoining Defendants and all persons acting in concert with them from proceeding with any shareholder vote on the Transaction or consummating the Transaction, unless and until Watermark discloses the material information discussed above which has been omitted from the Proxy Statement or corrects its material misstatements;

(b) In the event the Transaction closes, directing Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

(c) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

(d) Granting such other and further relief as this Court may deem just and proper.

Dated: June 14, 2022

        Laurence M. Landsman
        Landsman Saldinger Carroll, PLLC
        161 North Clark Street, Suite 1600
        Chicago, IL 60601
        (312) 291-4650
        landsman@lsclegalcom
        (Local Counsel)

        Lynda J. Grant
        TheGrantLawFim, PLLC
        521 Fifth Avenue, 17th Floor
        New York, NY 10175
        Tel: (212) 292-4441
        Fax: (212-292-4442
        Email: Lgrant@grantfirm.com

        **Counsel for Plaintiff**

        /s/ Laurence M. Landsman